# EXHIBIT "A"

## MASTER AGREEMENT FOR SALE AND ASSIGNMENT OF CONTRACTS
## BY AND BETWEEN
## UNIVEST CAPITAL, INC.
## AND
## TRAILPODS ACCEPTANCE CORPORATION

This Master Agreement for Sale and Assignment of Contracts ("Agreement" or "Master Assignment Agreement"), is entered into this 30th day of December, 2011, by and between Univest Capital, Inc., a subsidiary of Univest National Bank and Trust Co. ("Purchaser"), a Pennsylvania corporation and Trailpods Acceptance Corporation, a Florida corporation ("Seller" and/or "Guarantor").

### RECITALS:

A. Purchaser is, among other things, in the business of purchasing chattel paper, consisting of Contracts.

B. Seller is the owner of certain Contracts; and

C. From time to time, upon the satisfaction of the terms and conditions contained herein, Seller may elect to sell and Purchaser may, from time to time, purchase Seller's right, title and interest in and to certain of said Contracts pursuant to the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the above premises and the promises, representations, warranties, covenants, terms and conditions stated below, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and the parties intending to be legally bound hereby, the parties agree as follows:

1. DEFINITIONS. Capitalized terms used in this Agreement without definition have the meanings assigned thereto in the Glossary of Terms of even date herewith agreed to by Purchaser and Seller and attached hereto as Annex I.

2. PROCEDURES FOR PURCHASE TRANSACTIONS; CLOSINGS. Notwithstanding the procedures used for closing of previous, already purchased, Contracts, the following subparagraphs listed below will control closings of future purchases.

a. Process. Proposed sales of Contracts shall be offered for purchase as follows:

(1) At least five (5) Business Days prior to the Closing Date Seller shall notify Purchaser of Seller's intention to sell Contracts to Purchaser, together with a general description of Seller's proposed Portfolio of Contracts.

(2) At least three (3) Business Days prior to the Closing Date, Seller shall deliver to Purchaser, in electronic format (in a form acceptable to Purchaser and which shall include, at a minimum, all of the information described on Exhibit 1 hereto), a detailed description of the proposed Portfolio of Contracts.

(3) At least two (2) Business Days prior to the Closing Date Seller and Purchaser shall endeavor to agree upon all the Contracts which shall be included within the Portfolio to be purchased, together with the Discount Rate and related Total Purchase Price for such proposed Portfolio of Contracts.

(4) At least one (1) Business Day prior to the Closing Date, Seller and Purchaser shall agree upon any final adjustments in the Total Purchase Price and shall arrange for the funding of the Total Purchase Price on the Closing Date.

(5) On or before the Closing Date Seller and Purchaser shall execute and deliver the documents and take the actions described in Sections 3 and 9 below. Seller agrees to execute and deliver, or cause to be executed and delivered, following any Closing Date such other documents and instruments, in form and substance satisfactory to Purchaser and its counsel, as may be reasonably requested by Purchaser to evidence the transfer and assignment of the Contracts to Purchaser.

(6) The minimum Total Purchase Price for each Portfolio of Contracts purchased by Purchaser hereunder shall be $80,000. Purchases of Portfolios of Contracts shall not occur more often than twice (2x) each calendar month.

(7) THE AGGREGATE ADCB OF ALL PORTFOLIOS AT ANY ONE TIME OUTSTANDING HEREUNDER SHALL NOT AT ANY TIME EXCEED $5,000,000.

b. Closings. The closing (the "Closing") of each Supplemental Assignment will take place at the offices of Univest Capital, Inc., 3331 Street Road, Suite 325, Bensalem, PA 19020, or at such other location designated by Purchaser on the date specified in the Supplemental Assignment (the "Closing Date"). Purchaser and Seller understand and agree that all specified times are of the essence.

c. Commitment. Seller expressly acknowledges that the execution of this Agreement does not represent a commitment on the part of Purchaser to purchase any Contracts from Seller. Any such commitment shall only arise when and if Seller presents to Purchaser a Portfolio of Contracts that complies with all of the terms of this Agreement and Seller and Purchaser execute and deliver the Supplemental Assignment and take all of the other actions required under this Agreement applicable thereto.

3. SALE AND ASSIGNMENT.

a. Property, Rights and Interests being Sold and Assigned. In consideration of the payment by Purchaser to Seller of the Total Purchase Price as more fully described in

Section 4 and as set forth in each Supplemental Assignment, Seller shall sell, assign, convey and transfer all of Seller's right, title and interest in and to the following property (the "Assigned Property") to Purchaser, its successors and assigns, subject to the terms of this Agreement:

(1) the Contracts identified on and attached to the applicable Supplemental Assignment;

(2) all receivables, proceeds and products (including, without limitation, all remaining Scheduled Payments, Puts, Balloon Payments, and insurance proceeds) under or relating to the Contracts;

(3) all security agreements, mortgages, letters of credit, certificates of deposit, deposit accounts (not to include end of Contract term deposits or special, unique Livingston deposits),  accounts and general intangibles relating to the Contracts;

(4) all Guarantees (if any) of the Obligors' obligations under the Contracts;

(5) all of Seller's rights, titles and interests relating to the Contracts and the Assigned Property arising under third-party contracts, arising under law, or arising otherwise (including, without limitation, rights arising under agreements between Seller and its equipment vendors and/or Seller and Brokers);

(6) all books, records, documents, files, computer print-outs and data of any kind or nature pertaining to the Contracts.  Where any of these items are in the possession of COWS, a copy of that item, as needed, will be provided by Seller to Purchaser;

(7) a first priority, perfected security interest in all of Seller's right, title and interest in and to the Equipment under and as defined in each Contract; and

(8) a security interest in the Cash Collateral Amount.

b. <u>Eligible Contracts</u>. Seller and Purchaser agree that only Eligible Contracts shall be subject to purchase hereunder. For purposes of this Agreement, the term Eligible Contracts means and refers to Contracts which meet all of the following specifications:

(1) such Contract is payable in currency of the United States of America for Equipment located in and which prohibits relocation of the Equipment outside of the United States for an Obligor that has a billing address in the United States;

(2) such Contract is a net, hell or high water non-cancelable lease representing an irrevocable, unconditional, non-cancelable, fixed periodic payment obligation (without the right to set off for any reason) and net of any maintenance or cost per copy or similar charges;

(3) the Obligor thereunder is required to maintain the Equipment, pay all taxes, and provide adequate insurance;

(4) such Contract is or can be sold to Purchaser, free and clear of all liens, except for the interest of the Obligor under the Contract;

(5) such Contract is valid and enforceable in accordance with its terms except to the extent that such enforceability is limited by applicable bankruptcy and insolvency laws and equitable principles that affect creditors' rights generally;

(6) such Contract is not more than thirty (30) days past due at the time of determination of eligibility hereunder;

(7) such Contract has not been more than thirty (30) days past due more than one time in the prior twelve months;

(8) the payment terms have never been rewritten or extended;

(9) such Contract has a maximum remaining term of at least sixty (60) months;

(10) such Contract provides for fixed monthly payments;

(11) such Contract provides that Seller may accelerate payments if the Obligor is in default thereunder;

(12) If the Contract provides for a security deposit such Contract provides that the Obligor may not elect to utilize its Security Deposit to offset any Scheduled Payment thereunder;

(13) such Contract will not include as part of the ADCB calculation amount hereunder the amount of any Security Deposit;

(14) such Contract provides in the event of a casualty loss of the Equipment thereunder that the Obligor is required to pay, at a minimum, the full replacement value of the Equipment;

(15) such Contract is not, nor has it ever been, a Defaulted Contract nor has Seller repossessed the related Equipment and/or released said Equipment as part of any Contract contained in any purchase schedule;

(16) the Obligor under such Contract has not defaulted with respect to any other contract or agreement with Seller nor has the Seller repossessed any equipment or other property related to any other contract with such Obligor;

(17) if an Obligor claims tax-exempt status for such Contract, the related Contract File includes a copy of the Tax Exemption Certificate if such Tax Exemption Certificate is available and in the possession of Seller;

(18) such Contract is not, except to the extent permitted in accordance with the portfolio concentration criteria set forth in Section 3.c. hereof, a lease or loan to a government, government authority or not-for-profit entity;

(19) such Contract does not require the Seller or any other person (other than Obligor) to perform any services, and no part of any Scheduled Payment thereunder is deemed as compensation for any such services;

(20) such Contract is fully assignable without notice or consent of the Obligor;

(21) the original chattel paper for such Contract for UCC purposes is in the possession of Seller;

(22) such Contract is not a consumer lease, contract or loan;

(23) the Obligor under such Contract is not an Affiliate of Seller;

(24) To the best of Seller's knowledge, such Contract complies in all material respects with all applicable laws and regulations;

c. <u>Portfolio Concentration Criteria.</u> As of the time of each purchase and sale of Contracts hereunder and, if applicable, at the time of Seller's substitution of any Substitute Contracts for any Defaulted Contracts pursuant to provisions of Section 5.d., below, the Obligor concentration mix within the Portfolios shall be consistent in all material respects with Seller's Credit and Collection Policy.

d. <u>No Assumption of Obligations or Liabilities</u>. ALL OBLIGATIONS, DUTIES, RESPONSIBILITIES AND LIABILITIES ("OBLIGATIONS") UNDER THE CONTRACTS WHICH EXIST, ACCRUE AND/OR ARE INCURRED AND OR WILL EXIST, ACCRUE OR BE INCURRED, AS THE CASE MAY BE, UNDER EACH SCHEDULE, OR ARISE BY ACTS OR OMISSIONS OF SELLER PRIOR OR SUBSEQUENT TO THE CLOSING UNDER EACH SCHEDULE, SHALL REMAIN WITH SELLER AND CONTINUE TO BE SELLER'S OBLIGATIONS, AND NOTHING HEREIN SHALL BE CONSTRUED TO CONSTITUTE A TRANSFER TO, OR AN ASSUMPTION BY, PURCHASER OF SUCH OBLIGATIONS.

e. <u>Characterization of Transaction; Security Interests in Assigned Property.</u>

(1) SELLER AND PURCHASER INTEND THE TRANSACTIONS CONTEMPLATED IN THIS AGREEMENT AND MADE EFFECTIVE BY THE EXECUTION OF ANY SUPPLEMENTAL ASSIGNMENT TO BE A COMPLETE AND PRESENT SALE AND ASSIGNMENT OF THE ASSIGNED

PROPERTY AND NOT A FINANCING OR AN ASSIGNMENT FOR
COLLATERAL PURPOSES.

(2) Without limiting the provisions contained in Subsection 3.e.(1) above, in order
to preserve Purchaser's rights under this Agreement in the event a court or other
forum characterizes the transactions hereunder as loans, as security for the
performance by Seller of all of Seller's obligations under this Agreement (and any
Supplemental Assignment issued pursuant hereto), Seller hereby grants to
Purchaser, subject to Subsection 3.e.(4) below, a first priority security interest in all
of the Assigned Property. Seller and Purchaser acknowledge that this Subsection is
intended to constitute a security agreement under the UCC and all other applicable
laws.

(3) Seller shall pay all initial fees and expenses associated with perfecting and
continuing the perfection of Purchaser's security interest in the Assigned Property
at the time of purchase, including without limitation, the cost of filing all financing
statements under the Uniform Commercial Code, as and when reasonably required
by Purchaser in its sole reasonable discretion. Any costs associated with renewal
or amendments to the financing statements, if deemed necessary by Purchaser for
purchased contracts they still hold, will be born by Purchaser.

(4) Purchaser's security interests with respect to any additional collateral securing
an Obligor's obligations associated with a Contract (such as any blanket collateral
liens against any such Obligor) shall, if such Obligor has from time to time other
obligations to Seller or Seller's assignees, be shared *pari passu* with Seller or
Seller's assignees, as the case may be.

f. Subordination. Seller hereby subordinates any residual interest that Seller has in
the Equipment subject to a Contract to Purchaser's rights with respect to such Contract;
provided that upon payment in full of the Aggregate ADCB of each Purchased Contract to
Purchaser, such subordination will cease with respect to such Contract and the Purchaser
will release its interest in the residual interest and its security interest in the related
Equipment back to Seller.

g. Incorporation of Supplemental Assignment. Whenever reference is made herein
to the term "sale and assignment" or a similar term, it shall be deemed to mean the
transaction contemplated by a Supplemental Assignment. Each Supplemental Assignment
and the Attachments attached thereto shall constitute a separate and independent sale and
assignment of a Portfolio of Contracts by and between Purchaser and Seller which
incorporates all terms and conditions of this Agreement. In the event of a conflict between
the terms and conditions of this Agreement and any provision of such Supplemental
Assignment, the provisions of such Supplemental Assignment shall prevail with respect to
the transactions contemplated under such Supplemental Assignment only.

h. Evidence of Assignment. This Agreement, the executed Supplemental
Assignment and Exhibits thereto (together with the other documents, exhibits, papers and

writings executed pursuant hereto, shall be the operative documents evidencing the sale and assignment of a Portfolio described therein.

4. CONSIDERATION; FUNDING AND PERIODIC PAYMENTS; MONTHLY REPORTING.

a. As good and valuable consideration for the sale and assignment of the Contracts subject to each Supplemental Assignment and related Assigned Property, Purchaser agrees to pay to Seller and Seller agrees to accept the Total Purchase Price with respect to such Supplemental Assignment.

(1) The amount to be paid by Purchaser to Seller at the Closing (the "Closing Payment") shall be equal to the Total Purchase Price for all of the Contracts subject to such Supplemental Assignment *minus* the Cash Collateral Holdback Amount. The Closing Payment shall be paid by Purchaser to Seller at the Closing by check(s) or wire transfer of immediately available funds to an account to be designated by Seller.

(2) Cash Collateral Holdback Amounts retained by Purchaser shall be placed in the Cash Collateral Account and shall be subject to the provisions of subsection 5.e., below.

b. As set forth in Section 3 above, all Scheduled Payments paid or payable and accrued with respect to the period from and after the Cut-Off Date under all Contracts shall be the property of Purchaser. The closing date of this Agreement and the date to be used for the calculation of the purchase price will be December 30, 2011.

5. RECOURSE TO SELLER. In addition to the other remedies available to Purchaser under this Agreement and other remedies available to Purchaser under law or in equity (including without limitation, Purchaser's remedies under Section 8 below), Purchaser shall have the following remedies:

a. Recourse Pool for Credit Defaults. A Recourse Pool is hereby established as a bookkeeping entry to which shall be contributed an amount equal to a mutually agreed upon amount initially equal to $250,000. In the event that a Contract (other than a Contract subject to recourse under Section 5.b., below) becomes a Defaulted Contract, then promptly (and in all events within twenty (20) days thereafter ("Repurchase Date"), Seller shall, to the extent there is a balance in the Cash Collateral Account, repurchase such Contract for its then Contract Balance and such Contract Balance will be subtracted from the balance in the Cash Collateral Account. Seller shall exercise rights and remedies with respect to the Defaulted Contract and the related Equipment; any net recoveries from the exercise of such rights and remedies shall be retained by Seller and added back to the Cash Collateral Account, it being the intent of the parties that only the net loss suffered in connection with a Defaulted Contract shall be a deduction from the applicable Cash Collateral Account.

b. <u>Recourse for Breach of Representation, Warranty or Covenant</u>. Notwithstanding subsection 5.a., above, in the event that (i) a Contract becomes a Defaulted Contract and there is any material inaccuracy in, or breach of, any representation, covenant or warranty made by Seller under this Agreement with respect to such Contract or (ii) the Obligor fails to make any of the first three (3) Scheduled Payments when due under a Contract immediately after Purchaser's purchase of such Contract and the Contract becomes a Defaulted Contract, then promptly (and in all events within ten (10) days thereafter ("Repurchase Date"), Seller shall repurchase such Contract for its then Contract Balance and there shall be no adjustment to the Recourse Pool with respect to such repurchase.

c. <u>Reconveyance of Assigned Property.</u> Upon a repurchase by Seller of a Defaulted Contract, Seller shall assume the defense of any claims relating to such Contract which is repurchased, except any defenses based on Purchaser's own gross negligence or willful misconduct. Within fifteen (15) days of Purchaser's receipt of the Contract Balance from Seller and Seller's written request to do so, Purchaser shall (i) reassign the Contract and all of Purchaser right, title and interest in and to the related Assigned Property to Seller without representation or warranty, express or implied, and without recourse to Purchaser, except that Purchaser shall warrant that the Contract and related Assigned Property is free and clear of any Liens created by or through Purchaser and that Purchaser has the authority to assign such Contract, and (ii) deliver to Seller the related Contract File and all other documents and papers in Purchaser's possession.

d. <u>Substitution of Contracts.</u> In lieu of satisfying the recourse obligation by paying the Contract Balance contemplated by Subsections 5.a. and 5.b. above, and provided Seller is not in default of any of its obligations to Purchaser contained herein, Seller may substitute a new Eligible Contract having Scheduled Payments, a remaining term and an ADCB (calculated as of the Repurchase Date) of not less than the Scheduled Payments, remaining term and ADCB of the Contract being replaced (a "<u>Substitute Contract</u>") provided that the creditworthiness of the Obligor is acceptable to Purchaser in its sole discretion and subject to Purchaser's overall approval of the Substitute Contract, which approval shall not be unreasonably withheld.

e. <u>Cash Collateral Account</u>.

(1) Seller hereby grants Purchaser dominion and control over and a first priority security interest in, lien on and pledge of all of Seller's deposits maintained from time to time in the Cash Collateral Account. The Cash Collateral Account shall be blocked in favor of Purchaser pursuant to the Blocked Account Agreement in the form of Exhibit 2 hereto, which Blocked Account Agreement shall be executed at the initial Closings hereunder.

(2) In the event Seller defaults in its payment of any Contract Balance arising under Sections 5.a. or 5.b. which default continues for a period of ten (10) Business Days following the designated Repurchase Date, Seller shall be deemed to be in default of its obligations under this Agreement and, in addition to all other remedies

available to Purchaser, Purchaser shall have the right to have disbursed to it from the Cash Collateral Account the Contract Balance then due.

6. SELLER'S REPRESENTATIONS AND WARRANTIES.

a. With respect to each sale and assignment transaction represented by a Supplemental Assignment or a substitution of Contact under Section 5.d., above, Seller, for itself, its successors and assigns, hereby represents, covenants and warrants to Purchaser the following, each of which shall be true, correct, accurate and complete as of the Closing Date designated on each Supplemental Assignment and the date of the substitution of the Substitute Contract, and each of which shall survive the Closing Date or substitution date:

(1) Organization. Seller is a corporation, duly organized and validly existing under the laws of the State of Florida. Seller has the power to own its assets and to transact the business in which it is presently engaged. Seller shall not change or adopt a new state of organization unless Seller furnishes to Purchaser at least sixty (60) days prior written notice of any such proposed change.

(2) Good Standing; Qualification. Seller is in good standing in its state of its organization and is qualified to do business in all states in which, because of the nature of its respective activities or properties, such qualification is required pursuant to the laws of such state, other than states, either individually or in the aggregate in which the failure to be so qualified would not have a material adverse effect on its business or properties taken as a whole or affect the enforceability of any Contract.

(3) Proper Action; Consents. Seller has the power to execute, deliver and perform this Agreement and has taken all action necessary to authorize and perform all of the transactions contemplated in this Agreement. Neither the execution, delivery and performance of this Agreement nor the undertaking of the other actions contemplated under this Agreement requires the consent, approval, authorization, order, registration or qualification of any Person or entity.

(4) No Violation of Agreements. Etc. The execution, delivery and performance by Seller of this Agreement and any Supplemental Assignment will not conflict with or result in a material breach of or violate any material term, condition or provision of (i) any covenant, instrument or agreement to which Seller is a party, (ii) Seller's bylaws or charter, or (iii) any court or administrative order or decree.

(5) Execution and Delivery. This Agreement and each Supplemental Assignment executed hereunder will be duly executed and delivered by Seller and constitute the valid and legally binding obligation of Seller enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws of general application affecting the enforcement of creditors' rights or by general principals of equity limiting the

availability of equitable remedies or by the exercise of the discretional powers of any court or other authority before which a proceeding may be brought seeking equitable remedies, including, without limitation, specific performance and injunctive relief.

(6) No Violation of Laws. The performance by Seller under this Agreement and the consummation of the transactions hereunder will not violate in any material respect any local, state or federal law, statute, rule or regulation.

(7) Suits; Judgments. There are no law suits or other adversarial proceedings of any kind or nature brought by any governmental body or private Person or entity, or any judgments, orders, writs or injunctions of any court or governmental body or other regulatory or administrative agency or commission, presently in effect or pending or, to Seller's knowledge, threatened against Seller or its properties (including but not limited to the Contracts) that are expected to materially and adversely affect the business, operations or financial condition of Seller or the ability of Seller to perform its obligations under this Agreement.

(8) No Other Agreements Affecting Purchaser's Rights and Interests. There are no oral or written agreements of any kind between Seller and any other Person (including without limitation, Brokers, Vendors, Obligors, Guarantors, lenders or governmental bodies) which will or may materially adversely affect Purchaser's interests in or to any of the Contracts or the property and rights being sold, assigned or conveyed to Purchaser under this Agreement and the Supplemental Assignment(s) executed hereunder.

(9) Other Business or Trade Names. Within the last seven (7) years, Seller has not conducted business under any fictitious name. There are no UCC financing statements filed in any jurisdiction against Seller or under which Seller is the debtor other than those which identify Seller under such name.

(10) Insolvency. Seller is solvent and able to perform its obligations and pay its debts as the same fall due. The sale and assignments contemplated hereby will not render Seller insolvent or unable to perform its obligations or pay its debts as the same fall due.

(11) Location of Seller. Seller is "located" for purposes of Section 9307(e) of the UCC in the state of Florida.

b. With respect to each sale and assignment transaction represented by a Supplemental Assignment entered into in connection herewith, Seller, for itself, its successors and assigns, hereby represents, covenants and warrants to Purchaser the following with respect to each and every Contract being sold and assigned hereunder, each of which shall be true, correct, accurate and complete as of the Closing Date designated on each Supplemental Assignment, and each of which shall survive the Closing Date designated on each Supplemental Assignment:

(1) <u>Bona Fide Contract Transaction: Completeness of Contract File.</u> All documentation constituting the Contract transaction contained in the Contract File is complete, true, and accurately sets forth and describes the transaction contemplated thereby in all material respects. The Contract File contains, inter alia, a Contract, Delivery and Acceptance Certificate (if none, proof of delivery of the Equipment and first payment(s) made by Obligor), Certificate of Insurance, if applicable, and all other agreements, documents and papers which are necessary to enforce the rights thereunder.

(2) <u>Execution and Delivery</u>.  Each Contract has been duly executed and delivered by the Obligor thereunder and constitutes the valid and legally binding obligation of Obligor enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws of general application affecting the enforcement of creditors' rights or by general principals of equity limiting the availability of equitable remedies or by the exercise of the discretional powers of any court or other authority before which a proceeding may be brought seeking equitable remedies, including, without limitation, specific performance and injunctive relief.

(3) <u>No Duplicate Original; No Claims of Defenses</u>. There are no duplicate original-signature Contract documents, including but not limited to the Contract, Delivery and Acceptance Certificate, Guaranty or other operative legal documents with respect to the Contract and Seller has delivered to Collateral Custodian on behalf of Purchaser all originals of the operative legal documents of each Contract, except for those properly in the possession of the Obligor and/or Guarantor or public recording office. The Contract is the only agreement between Seller and Obligor concerning the leasing or financing of the Equipment described therein. The Contract is, as of the Closing Date or date of the substitution of a Substitute Contract, free from pending and, to Seller's knowledge, threatened defenses, counterclaims and set-offs.

(4) <u>No Other Sale or Assignment</u>. The Assigned Property with respect to each Contract has not been assigned, sold or transferred except to Purchaser as expressly provided for in this Agreement.

(5) <u>Authenticity; Genuineness of Signatures</u>. All names, addresses, material statements and facts contained in the Contract documents by Seller, and by the Obligor are true, complete and correct in all material respects. Seller's signature and, the Obligor's signature are genuine and authentic.

(6) <u>Conformance with Law</u>. The Contract and the transactions contemplated thereby conform in all material respects to all applicable federal, state and local laws, statutes, rules and regulations, and Seller has complied in all material respects with all applicable federal, state and local laws and regulations relating to purchasers, financiers and lessors of equipment. Each Contract was either

originated by Seller or interests therein acquired by Seller in the ordinary course of business.

(7) <u>Rights in Assigned Property;  Power to Sell</u>. Seller owns the Assigned Property related to each Contract and has the legal power to sell and assign the same to Purchaser. Seller either has good and marketable title to, or has a first priority perfected security interest in, the Equipment and is the sole owner of all of any Purchase Option, Put or Balloon Payment relating to such Contract and has the legal power to sell same to Purchaser. The Assigned Property, Equipment, Purchase Options and Puts are free and clear of any and all Liens, rights of third parties or other Liens of any kind or nature whatsoever (except for the rights of the related Obligor and any one claiming by or through such Obligor under the Contract and the rights of Purchaser hereunder).

(8) <u>Perfection of Security Interest.</u> The Seller has filed a UCC- 1 financing statement or statements filed in all filing offices in which it is necessary to file in order to create a first priority perfected security interest in the Equipment pursuant to the UCC. Such security interest shall be deemed to be automatically assigned to Purchaser by operation of law and the consummation of the sale and assignment contemplated in a Supplemental Assignment, without the necessity of filing a UCC assignment statement or other document in any filing office. No part of any property or Equipment in which a security interest has been created to secure Obligor's obligations under a Contract has been released from such security interest. The Seller has with respect to each Contract which is a "Finance Lease", i.e. not a "lease intended as security", sold the leasehold interest evidenced by the Contract and Seller only retains a residual interest in the Equipment for the period beginning after the end of the scheduled term of each Contract.

(9) <u>Performance of Obligations; No Claims or Potential Claims</u>. Seller shall perform any obligations that it has under the Contract. There are no actual, pending or, to Seller's knowledge, threatened suits, demands, governmental proceedings, claims, counterclaims, or set-offs (including, without limitation, claims relating to alleged lessor warranties, tort liability, usury, contract liability or environmental liability) asserted against Seller by the Obligor under the Contract, by any Guarantor or by any other Person with respect to the Contract, nor are there, to Seller's knowledge, any events, facts or circumstances existing prior to the Closing which, subsequent to the Closing, could give rise to any such claims. Seller has not been the subject of any proceeding nor has there been any investigation by or before any regulatory authority in connection with the Seller's business practices with respect to the Contracts, or the acquisition, collection or administration thereof.

(10) <u>Going Concern; No Bankruptcies</u>. To the best of Seller's knowledge, (i) the Obligor is in business and operating as a going concern as of the Closing Date; (ii) neither the Obligor nor any Guarantor has, at any time from the commencement of the Contract through the Closing Date, filed (or had filed against it) or threatened

to file a petition in bankruptcy, entered into an assignment for the benefit of creditors, or is the subject of any receivership or any other insolvency-related proceeding; and (iii) neither the Obligor nor any Guarantor was a party in any bankruptcy, assignment-for-the-benefit-of-creditors, receivership or other insolvency-related proceeding at the time the Contract commenced.

(11)  Non-Cancelable Contract; No Mid-Term Buyout or Termination Rights. Except as expressly permitted by the definition of the term Eligible Contract under Section 3 b. hereof, each Contract is non-cancelable for the full remaining term as set forth on the applicable Supplemental Assignment therefor. Except as otherwise expressly set forth in the Contract or related documents provided to Purchaser prior to the Closing Date, the Obligor does not have a right under the Contract or any other agreement to buy-out or terminate the Contract prior to the completion of the original term, except in connection with a casualty to the Equipment. Notwithstanding the foregoing, Seller and Purchaser acknowledge that prepayments or early termination by Obligors of their respective Contracts may be permitted so long as the prepayment or early termination results in a recovery to Purchaser at least equal to the Contract Balance.

(12) No knowledge of Future Defaults. Up to and as of the Closing Date, Seller is unaware of any fact or circumstance which could result in a material default by the Obligor under the terms of the Contract or a material default by any Guarantor under any Guaranty relating to the Contract.

(13) Eligible Contract. Each Contract is an Eligible Contract and conforms in all material respects to the form(s) of agreement attached hereto as Exhibit 3.

(14) No Restructures, Re-Agings. Modifications or Amendments. Except as set forth in writing in the Contract File, each Contract has not been re-aged, rewritten, restructured, modified or amended at any time during the term of the Contract.

(15) No Default Under Contract. The Obligor is not in default in any material respects under the terms of the Contract. No Guarantor is in default in any material respects under the terms of any Guaranty with respect to such Contract. The receivable under the Contract has never been charged off (written off) Seller's books at any time.

(16) No Other Agreements. There are no oral or written agreements by and between Seller and the Obligor or any Guarantor other than those set forth in writing in the Contract File.

(17) No Litigation. The Contract is not, as of the Closing Date, and has never been, the subject of litigation or other dispute between Seller and the parties thereto.

(18) Acceptance of Equipment. The Obligor has delivered it Acceptance Certificate with respect to the Equipment to Seller and Seller has no knowledge of

any non-compliance of the Equipment with any applicable federal, state, local and other laws, rules and regulations, any licenses or permits issued pursuant to such laws including, without limitation, all Environmental Laws.

(19)  No Dishonored Checks.  There has not been, within the six (6) month period preceding the sale and assignment transaction represented by a Supplemental Assignment, any payment (check, draft, etc.) either submitted by Obligor to Seller or posted to the Obligor's Contract included within such Supplemental Assignment which was dishonored and uncollected.

(20)  All Payments Posted. Any advanced Scheduled Payment(s) or other form of consideration paid by the Obligor to Seller prior to the Closing which the Obligor is entitled (under the Contract or otherwise) to deduct from the Obligor's payment obligations subsequent to the Closing has not been included in the calculation of Total Purchase Price pursuant to Section 4.

(21) Origination of Contracts.  Seller is the originator of the Contract or Seller acquired the Contract in a bona fide transaction from a third party Vendor Broker or financial institution, free and clear of all liens, claims and encumbrances.

(22) Obligor Charges. All Charges that are chargeable to the Obligor pursuant to the terms of such Obligor's Contract have been duly paid or are the contractual and legal responsibility of Obligor subsequent to the Closing.

(23) Seller Charges. All Charges that are not chargeable to an Obligor under the terms of such Obligor's Contract and that are the contractual and legal responsibility of the Seller at or subsequent to the Closing and will be paid by Seller as the same fall due unless being contested in good faith and by appropriate proceedings.

(24) Credit Approval According to Seller's Credit Policy. The credit application relating to each Contract was approved by Seller in accordance with its Procedures.

(25) Seller's Lease Administration.  The Equipment Lease was administered (including, without limitation, billed and collected) by Seller in accordance with its established written administration policy.

(26) No Prepayments. The Obligor has not prepaid any Schedule Payments used to calculate the Total Purchase Price or any amount in respect of a Purchase Option, Put or Balloon Payment.

(27) Environmental Laws. Seller has complied with all material Environmental Laws applicable to Seller .

(28)  Equipment Not Environmentally Hazardous. To the extent breach thereof might impair the enforceability of the Contract or the value of the Equipment,

Seller has no knowledge of any Environmental Claim relating to such Contract or the Equipment subject thereto.

(29) No Bulk Sales, Assignments or Subleases. Seller has not received written or verbal notice from the Obligor of a bulk sale (or pending bulk sale) of the Obligor's assets, or notice of the Obligor's attempt to assign its rights under the Contract or sublease the Equipment.

(30) Assignability of Contract. The Contract and related Assigned Property are assignable to Purchaser under applicable law.

(31) Equipment; Commercial Use. Each Contract was originated in connection with the sale or financing of Equipment for commercial, industrial or other business use and not for personal, household or family purposes.

(32) Additional Collateral. The Contract File includes any items of additional collateral, excepting deposit accounts such as end of Contract term deposits or special, unique Livingston deposits but including, without limitation, any letters of credit and certificates of deposit, which has been issued for or assigned to secure the payment and/or performance of the Obligor's or any Guarantor's obligations relating to the Contract, and upon and after Closing, Purchaser be entitled to all rights and benefits of Seller thereunder.

(33) Governmental Contracts. Except as disclosed on or pursuant to an applicable Supplemental Assignment and except to the extent permitted in accordance with Section 3.c. above, none of the Obligors under the Contracts sold and assigned hereunder are federal, state or other governmental entities.

(34) Concentration Limits. As of the time of each purchase and sale of Contracts hereunder and, if applicable, at the time of Seller's substitution of any Substitute Contracts for any Defaulted Contracts pursuant to provisions of Section 5.d. hereof, the Portfolios of all of the Contracts hereunder complies with the portfolio concentration criteria set forth in Section 3.c. hereof.

Seller acknowledges that Purchaser, in purchasing the Contracts, is relying upon the foregoing representations, covenants and warranties of Seller. Seller agrees that Purchaser knowledge of any breach of or inaccuracy in any such representation, covenant or warranty prior or subsequent to the Closing shall not impair or constitute any waiver of same or of the obligations of Seller under this Agreement. Purchaser shall have no duty to notify Seller of any breach of or inaccuracy in same which may come to Purchaser's attention. Purchaser may from time to time, through its review of the Contracts or in its dealings with the Obligors, Guarantors or other Persons, observe breaches of or inaccuracies in Seller's representations, covenants or warranties, and further, Purchaser may from time to time advise Seller of same. The observation of such matters by Purchaser and the giving of such comments to Seller, or the failure to do so, shall not impair or constitute any waiver of any of Sellers obligations or agreements hereunder.

7. PURCHASER'S REPRESENTATIONS AND WARRANTIES TO SELLER. With respect to each sale and assignment transaction represented by a Supplemental Assignment entered into in connection herewith, Purchaser, on behalf of itself, its successors and assigns, hereby represents, covenants and warrants to Seller the following, each of which shall be true, correct, accurate and complete as of the Closing Date designated on each Supplemental Assignment, and each of which shall survive the Closing Date designated on each Supplemental Assignment:

a. Organization. Purchaser is a corporation, duly organized and validly existing under the laws of the State of Pennsylvania. Purchaser has the power to own its assets and to transact the business in which it is presently engaged.

b. Good Standing; Qualification. Purchaser is in good standing in its state of its organization and is qualified to do business in all states in which, because of the nature of its respective activities or properties, such qualification is required pursuant to the laws of such state, other than states, either individually or in the aggregate in which the failure to be so qualified would not have a material adverse effect on its business or properties taken as a whole or affect the enforceability of any Contract.

c. Proper Action: Consents. Purchaser has the power to execute, deliver and perform this Agreement and has taken all action necessary to authorize and perform all of the transactions contemplated in this Agreement. Neither the execution, delivery and performance of this Agreement nor the undertaking of the other actions contemplated under this Agreement requires the consent, approval, authorization, order, registration or qualification of any Person or entity.

d. No Violation of Agreements. Etc. The execution, delivery and performance by Purchaser of this Agreement and any Supplemental Assignment will not conflict with or result in a breach of or violate any term, condition or provision of (i) any covenant, instrument or agreement to which Purchaser is a party, (ii) Purchaser's bylaws or charter, or (iii) any court or administrative order or decree.

e. Execution and Delivery. This Agreement and each Supplemental Assignment executed hereunder will be duly executed and delivered by Purchaser and constitute the valid and legally binding obligation of Purchaser enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws of general application affecting the enforcement of creditors' rights or by general principals of equity limiting the availability of equitable remedies or by the exercise of the discretional powers of any court or other authority before which a proceeding may be brought seeking equitable remedies, including, without limitation, specific performance and injunctive relief.

f. No Violation of Laws. The performance by Purchaser under this Agreement and the consummation of the transactions hereunder will not violate in any material respect any local, state or federal law, statute, rule or regulation.

g. <u>Suits; Judgments</u>. There are no law suits or other adversarial proceedings of any kind or nature brought by any governmental body or private Person or entity, or any judgments, orders, writs or injunctions of any court or governmental body or other regulatory or administrative agency or commission, presently in effect or pending or, to Purchaser's knowledge, threatened against Purchaser or its properties (including but not limited to the Contracts) that are expected to materially and adversely affect the business, operations or financial condition of Purchaser or the ability of Purchaser to perform its obligations under this Agreement.

h. <u>Insolvency</u>. Purchaser is solvent and able to perform its obligations and pay its debts as the same fall due. The sale and assignments contemplated hereby will not render Purchaser insolvent or unable to perform its obligations or pay its debts as the same fall due.

## 8. <u>INDEMNITY</u>.

a. <u>Indemnity by Seller</u>. In addition to other remedies available to Purchaser pursuant to this Agreement or available under law or in equity, Seller shall defend and indemnify Purchaser, its successors and assigns, and their respective directors, officers, employees and agents (each a "Purchaser Indemnitee") from and against, and hold each Purchaser Indemnitee harmless from all Losses incurred by the Purchaser Indemnitee that accrue from or result by reason of (i) any inaccuracy in, breach or alleged breach of any of the representations or warranties made by Seller pursuant to this Agreement or a Supplemental Assignment, (ii) Seller's refusal or failure to fully and timely perform in accordance herewith any of its covenants, warranties, agreements, responsibilities, obligations or duties to Purchaser or to third parties provided for in this Agreement or any Supplemental Assignment, or (iii) the gross negligence or willful misconduct of Seller or a Seller Indemnitee; <u>provided,</u> that no Purchaser Indemnitee shall have the right to be indemnified hereunder for such Purchaser Indemnitee's own gross negligence or willful misconduct.

b. <u>Indemnity by Purchaser</u>. In addition to other remedies available to Seller pursuant to this Agreement or available under law or in equity, Purchaser shall defend and indemnify Seller, its successors and assigns, and their respective directors, officers, employees and agents (each a "Seller Indemnitee") from and against, and hold each Seller Indemnitee harmless from all Losses incurred by the Seller Indemnitee that accrue from or result by reason of (i) any inaccuracy in, breach or alleged breach of any of the representations or warranties made by Purchaser pursuant to this Agreement or a Supplemental Assignment, (ii) Purchaser's refusal or failure to fully and timely perform in accordance herewith any of its covenants, warranties, agreements, responsibilities, obligations or duties to Seller or to third parties provided for in this Agreement or any Supplemental Assignment, or (iii) the gross negligence or willful misconduct of Purchaser or a Purchaser Indemnitee; <u>provided,</u> that no Seller Indemnitee shall have the right to be indemnified hereunder for such Seller Indemnitee's own gross negligence or willful misconduct.

c. <u>Indemnification Notice</u>. The party seeking indemnification under Section 8.a. or 8.b. (the "Indemnified Party") agrees to give prompt notice to the party against whom indemnity may be sought (the "Indemnifying Party") of the assertion of any Claim or Loss, or the commencement of any suit, action or proceeding in respect of which indemnity may be sought under such Section. The Indemnified Party shall have the right, at the Indemnifying Party's expense (limited only to the extent that any and all costs incurred by the Indemnified Party, including attorney's fees, shall be reasonable), to control the defense of any such suit, action or proceeding. The Indemnifying Party shall have the right to participate in such defense by notice to the Indemnified Party within ten (10) days from the date of receipt of the Indemnified Party's notice of such claim, suit, action or proceeding. If, upon the Indemnified Party's consent, the Indemnifying Party assumes such defense, the Indemnifying Party shall not settle the same without the consent of the Indemnified Party, which consent shall not be unreasonably withheld.

d. <u>Survival.</u> The obligations of the parties under this Section 8, and under any other indemnification provisions of this Agreement, shall survive the execution and any termination of this Agreement, any Supplemental Assignment, the Closing and consummation of the purchase and sales contemplated hereunder, and any payment of any amount owing under, or any repurchase by Seller of, any Contract.

9. <u>CONDITIONS PRECEDENT TO PURCHASE.</u>

a. <u>Conditions Precedent to First Purchase</u>. Purchaser's purchase of the Seller's interest in the Contracts described in the first of the Supplemental Assignments is subject to fulfillment of each of the following conditions prior to or at the first Closing Date:

(1) <u>All Proceedings, etc. to be Satisfactory</u>. All proceedings, agreements, instruments, and documents required of Seller or required to be delivered under this Agreement shall be reasonably satisfactory in form and in substance to Purchaser and Seller.

(2) <u>No Material Breaches</u>. There shall not have been any material breach of the representations, covenants, warranties, or other agreements of Seller contained in this Agreement and such representations, covenants and warranties, as well as the other material information supplied by Seller to Purchaser, shall be substantially correct on the Closing Date and reasonably capable of verification by Purchaser.

(3) <u>UCC Statement(s) and Other Lien Filings</u>. A UCC financing statement or statements naming Seller as the "Seller" and Purchaser as the "Purchaser" covering the Contracts and Assigned Property now or hereafter purchased under this Agreement shall have been authorized by Seller for filing by Purchaser, in form and substance satisfactory to Purchaser. In addition, Purchaser shall be authorized to file UCC assignment statements (in form and substance satisfactory to Purchaser) and other appropriate filings necessary to transfer any liens against specific items of Equipment. All costs of filing any such UCC assignment

statements and other appropriate filings related to the Contracts after the initial filings that accompany the Contract(s) purchase shall be borne by Purchaser.

(4) <u>Secretary's Certificate</u>. Seller shall have delivered to Purchaser a certificate of Seller's corporate secretary certifying that attached to such certificate are true, correct and complete copies of (i) Seller's Certificate of Incorporation, (ii) Seller's By-laws, (iii) Seller's resolutions authorizing this Agreement and the transactions contemplated herein and including the officers of the Corporation that are authorized to sign on behalf of the Seller, including specimen signatures of such officers, and (iv) Seller's good standing certificate from the state of its incorporation dated, if not prior to the first Closing Date, as soon as practicable but not more than thirty (30) days following the first Closing Date.

(5) <u>Notice of Assignment</u>. Seller shall have delivered to Purchaser an undated Notice of Assignment executed in blank by Seller that may be completed, copied and delivered by Purchaser to each Obligor upon (and only upon) the occurrence and continuance of a Default.

(6) <u>Verification.</u> Purchaser shall have the option to complete verbal and/or written (either or both, at its sole election) verification of terms of the Contracts, with satisfactory results in Purchaser's sole and absolute discretion.

(7) <u>Lien and Judgment Searches.</u> Purchaser shall have completed Lien and judgment searches upon the Seller, at Seller's expense, and the results thereof shall be satisfactory to Purchaser.

(8) <u>Blocked Account Agreement</u>. Univest National Bank and Trust Co., Seller and Purchaser shall have entered into a Blocked Account Agreement in a form acceptable to Purchaser in its sole discretion with respect to the Cash Collateral Account.

   b. <u>Conditions Precedent to Each Purchase</u>. Purchaser's purchase of the Seller's interest in the Contracts described in each Supplemental Assignments is subject to fulfillment of each of the following conditions prior to each Closing Date:

(1) <u>All Proceedings, etc. to be Satisfactory</u>. All proceedings, agreements, instruments, and documents required of Seller or required to be delivered in connection with such Supplemental Assignment shall be reasonably satisfactory in form and in substance to Purchaser and Seller.

(2) <u>No Material Breaches</u>. There shall not have been any material breach of the representations, covenants, warranties, or other agreements of Seller contained in this Agreement and such representations, covenants and warranties, as well as the other material information supplied by Seller to Purchaser, shall be substantially correct on the Closing Date and reasonably capable of verification by Purchaser.

(3) Procedure. Seller shall have complied with the procedure set forth in Section 2., above.

(4) Completion of Due Diligence. Purchaser shall have completed its due diligence review of the Assigned Property as set forth in this Agreement and the results thereof shall be satisfactory to Purchaser in its sole judgment and discretion.

c. Power of Attorney. Seller hereby grants to Purchaser an irrevocable power of attorney coupled with an interest to (i) execute and file, on Seller's behalf as the secured party and assignee, all financing statements authorized to be filed hereunder in favor of the Purchaser, (ii) endorse in Seller's name checks and drafts received from Obligors which are made payable to Seller, and (iii) execute and deliver to Obligors Notices of Assignment as permitted by this Agreement.

10. SELLER'S COVENANTS TO PURCHASER. In addition to any other covenants and agreements stated in this Agreement, Seller covenants and agrees that:

a. Seller Advances. Seller will not make any payments for or on behalf of the Obligors under the Contracts.

b. Amendments and Modifications; Return of Equipment. Unless and until Seller repurchases a Contract and the related Assigned Property pursuant to this Agreement, Seller shall not accept returns or make substitutions for Equipment or other collateral or make or consent to any material amendments or modifications to the Contract or any related documents without Purchaser's consent.

c. Insurance. Seller will endeavor to cause Obligor to maintain any insurance on the Equipment with respect to any Contract as provided in the Contract.

d. Delivery of Contract Files. Seller agrees that with respect to each Contract, whether in Seller's or any other Person's possession, the risk of loss of the Contract, related Contract File, and any security thereunder shall remain with Seller until the same are delivered into the physical possession of the Collateral Custodian on behalf of Purchaser. In addition to other indemnities stated in this Agreement, Seller shall indemnify Purchaser for any and all losses or damages that result from the loss or destruction of the Contract Files until such time as the Contract File is delivered into the possession of the Collateral Custodian.

e. Further Assurances. In the event any further agreements, documents, papers or writings or any further actions are required by law or other government mandate, or are necessary or desirable to complete the transactions contemplated under this Agreement or any Supplemental Assignment or carry out the complete intent or expectations of the parties, Seller shall promptly, upon Purchaser's reasonable request, execute and deliver such agreements to Purchaser, prepare such documents, papers and writings and deliver same to Purchaser, and/or take such actions.

  f. <u>Financial Statements and Reports</u>. Seller will deliver, or caused to be delivered, to Purchaser:

   (1) *Annual Financial Statements of Seller*. As soon as available and in any event within sixty (60) days after each fiscal year of Seller, as applicable, the annual unaudited financial statement of Seller, prepared in accordance with GAAP, will be made available to Purchaser.

   (2) *Additional Information*. From time to time such additional information regarding the financial position or business of Seller as Purchaser may reasonably request.

  g. <u>Contract Obligations</u>. Seller shall promptly comply with all of its obligations, duties and responsibilities (if any) to the Obligors under or relating to the Contracts and other agreements (if any) between Seller and Obligors relating to the transactions described in the Contracts.

  h. <u>Change of Headquarters Office</u>. In the event Seller proposes to move its headquarters office from the location set forth above, Seller shall, no later than thirty (30) days prior to the date of any such move, notify Purchaser in writing and advise Purchaser of Seller's new location.

  i. <u>Security Interest.</u> Seller will not take any action nor fail to take any action which would have a material adverse effect on Purchaser's right, title and interest in and to the Contracts and Assigned Property as set forth herein and in each Supplemental Assignment.

  j. <u>Environmental Claims</u>. Seller shall promptly notify Purchaser of any Environmental Claim with respect to any Contract and/or Assigned Property of which Seller has actual knowledge.

  k. <u>Intellectual Property Claims.</u> Seller shall promptly notify Purchaser of any claim of violation of intellectual property rights with respect to any Contract and/or Assigned Property of which Seller has actual knowledge.

  l. <u>Tax Administration</u>. For so long as Purchaser is Servicer, Seller shall have no obligation to bill, collect or report any applicable sales, use or personal property taxes.

  m. <u>Reimbursement of Costs</u>. In the event Purchaser incurs any reasonable or necessary out-of-pocket costs in connection with the repurchase of any Contract as contemplated in Section 5 of this Agreement, Seller shall reimburse said costs to Purchaser immediately upon demand, provided Purchaser gives Seller reasonable proof of said costs.

  n. <u>Corporate Qualification</u>. Seller shall maintain its corporate existence and all necessary foreign qualifications in good standing in each jurisdiction in which the failure to do so is reasonably likely to have a material adverse effect on (i) the ability of Seller to perform its obligations under this Agreement, (ii) on the conduct of Seller's operations,

(iii) on the Seller's financial condition or (iv) on the value of, or the ability of Purchaser to realize upon, the Collateral.

o. Adverse Liens. Seller shall not sell, pledge, assign or transfer to any person or grant, create, incur, assume or suffer to exist any security interest in or lien against any of the Contracts or other Assigned Property purchased by or Collateral pledged to Purchaser.

p. Merger and Consolidation. Seller shall not enter into proceedings in total or partial dissolution; merge or consolidate with or into any Person; or acquire all or any substantial part of the properties or assets of any Person; or assign, transfer, sell, lease or otherwise dispose of all or any part of its properties or assets except in the ordinary course of its business, unless

(1) the Seller is the surviving entity in such merger or consolidation and Seller demonstrates to the reasonable satisfaction of Purchaser prior to the consummation of any such transaction that upon the consummation of such transaction Seller shall be and shall remain in compliance with all of the terms and conditions contained in this Agreement, or

(2) such Person or the merged or consolidated entity acquires substantially all the assets of the Seller as an entirety and prior to the consummation of any such transaction Purchaser consents to such transaction which consent shall be given if such Person executes and delivers to the Purchaser an agreement, in form and substance reasonably satisfactory to the Purchaser, which contains an assumption by such Person or entity of the due and punctual performance and observance of each covenant and condition to be performed or observed by the Seller under this Agreement; or

(3) such merger, consolidation or transfer of assets is to or with an Affiliate of Seller.

11. MISCELLANEOUS.

a. Complete Agreement. This Agreement (together with the other agreements to be executed by the parties hereunder, including the Supplemental Assignments and Exhibits contains the full and complete agreement between the parties on the subject matter set forth herein and supersedes all other prior written agreements and understandings between the parties, including, without limitation, any letter or letters of intent executed by the parties.

b. Governing Law and Venue. SELLER ACKNOWLEDGES AND AGREES THAT THIS AGREEMENT WAS NEGOTIATED, ACCEPTED AND EXECUTED BY THE PURCHASER IN BUCKS COUNTY, PENNSYLVANIA. ACCORDINGLY, THIS AGREEMENT AND THE RIGHTS AND DUTIES OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED PURSUANT TO PENNSYLVANIA LAW. ALL DISPUTES ARISING OUT OF THIS AGREEMENT SHALL BE, AT

PURCHASER'S OPTION, SUBJECT TO THE EXCLUSIVE JURISDICTION AND VENUE OF THE COURTS OF BUCKS COUNTY OR THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA, AND THE PARTIES CONSENT TO THE PERSONAL AND EXCLUSIVE JURISDICTION OF THESE COURTS.  SELLER FURTHER WAIVES ANY OBJECTIONS IT MAY HAVE AS TO PROPER VENUE OR FORUM NON-CONVENIENS OR SIMILAR CLAIMS WITH RESPECT TO THE JURISDICTION AND VENUE OF SUCH COURTS.

c.  Waiver if Jury Trial.  SELLER AND PURCHASER HEREBY WAIVE TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO WHICH THE SELLER AND PURCHASER MAY BE PARTIES ARISING OUT OF OR IN ANY WAY PERTAINING TO THIS AGREEMENT. THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE BY SELLER AND PURCHASER, BOTH OF WHOM HEREBY ACKNOWLEDGE THAT NO REPRESENTATION OF FACT OR OPINION HAS BEEN MADE BY EITHER PARTY TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT.  PURCHASER AND SELLER FURTHER ACKNOWLEDGE THAT THEY HAVE BEEN REPRESENTED IN THE SIGNING OF THIS AGREEMENT AND WAIVER BY INDEPENDENT LEGAL COUNSEL, SELECTED OF THEIR OWN FREE WILL, AND THAT THEY HAVE HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL, OR HAVE VOLUNTARILY WAIVED SUCH RIGHT.

d.  Modifications. This Agreement may not be modified except by a writing signed by executive officers of the parties.

e.  Section Titles. The section titles above shall not be construed to limit the terms of the text in such sections.

f.  Failure/Delay in Exercising Remedies. No failure or delay on the part of Purchaser in the exercise of any power, remedy or right, conferred in this Agreement; and no course of dealing between Purchaser and Seller shall operate as a waiver of such power, remedy or right.

g.  Notices. Any notice hereunder to Purchaser shall be delivered by one of the following methods and shall be effective: (i) upon delivery, if in person,  or (ii) upon transmission, if sent by facsimile (with machine-generated confirmation of successful transmission), or (iii) upon date of guaranteed delivery if sent by overnight mail by a nationally recognized carrier or (iv) upon date of receipt or refusal if sent by certified or registered mail, return receipt requested, in each case to the following addresses:

If to Seller:

Trailpods Acceptance Corporation
6700 NW 77ᵗʰ Ct.  Unit 100
Miami, FL  33166

Attn: _Mike Frank_

Fax: _786-242-6800_

If to Purchaser:

Univest Capital, Inc.
3331 Street Road, Suite 325
Bensalem, PA 19020
Attn.: William J. Clark, Senior Vice President
Fax: 1-866-604-8161

    h. Unenforceability of Part. Any provision of this Agreement or the other agreements contemplated herein which is prohibited or unenforceable shall, as to such provision, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions.

    i. Successors and Assigns.

    (1) This Agreement, each Supplemental Assignment and other agreements and obligations entered into pursuant to this Agreement shall inure to the benefit of, and be binding upon, Purchaser and Seller and their respective successors and assigns.

    (2) Purchaser may freely sell or assign its rights and interests in the Assigned Property being conveyed to Purchaser hereunder, and may freely pledge or otherwise encumber such Assigned Property, without the prior consent of Seller, provided that Purchaser remains the majority owner of the Assigned Property.

    j. Survival of Representations/Warranties/Indemnities. The representations, warranties, covenants, indemnities and agreements contained in or made pursuant to this Agreement shall survive the Closing unless otherwise provided herein.

    k. Cumulative Remedies. The remedies of a party provided by this Agreement are cumulative and not exclusive, and may be exercised as the same time or at different times, and are in addition to and not in lieu of additional remedies, if any, which may be provided by law.

    l. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same document.

    m. Unexecuted Drafts. In interpreting or construing this Agreement, no conclusions or arguments shall be made based upon the omission of material from unexecuted prior drafts of this Agreement.

n. <u>No Third-Party Beneficiaries.</u> Nothing stated in this agreement shall be construed to grant any rights to, or confer the status of third-party beneficiary upon, any third person or entity.

IN WITNESS WHEREOF, Purchaser and Seller, through their respective officers, have set their hands and seals to this Agreement on the dates indicated below.

**Univest Capital, Inc.**                    **Trailpods Acceptance Corporation**

By: _____          By: _____

Title: _____SVP_____          Title: 1/s   Vice President

12.30.2011

ANNEX I

## GLOSSARY OF TERMS

The following terms shall have the following meanings (such meanings shall be equally applicable to the singular and plural forms of the terms defined):

"Accrual Period" shall mean the period from and including the day after the previous Payment Date to and including the current Payment Date; provided that the Accrual Period associated with the date of each Closing hereunder shall commence on and include such Closing Date.

"Advances" shall mean the portion of the Total Purchase Price for each Portfolio of Contracts paid for by Purchaser less the Cash Collateral Holdback Amount.

"ADCB or the Aggregate Discount Contract Balance" shall mean the sum of the present values of the Scheduled Payments due on or after the applicable Cut-Off date, but excluding any unguaranteed purchase options, discounted using the applicable Discount Rate (as defined below) for such Contracts.

"Affiliate" means, with respect to any Person, (i) any other Person that directly, or indirectly through one or more intermediaries, controls such Person (a "Controlling Person") or (ii) any other Person which is controlled by or is under common control with a Controlling Person. As used herein, the term "control" of any Person means the possession, directly or indirectly, of the power to vote ten percent (10%) or more of any class of voting securities of such Person or to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Assigned Property" shall mean the tangible and intangible property, rights and interests referred to in Section 3 a. of the Master Assignment Agreement.

"Balloon Payment" means and refers to any required payment to be made by an Obligor under a Contract that is a loan upon the termination or expiration of such Contract.

"Blocked Account Agreement" shall mean that agreement between Seller and Purchaser concerning the pledge of the Cash Collateral Account in accordance with Section 5(e) of the Master Assignment Agreement (which may sometimes be referred to as "Deposit Account Pledge Agreement").

"Broker" shall mean any Person (except a Vendor) who arranged and/or originated a Contract and subsequently sold and assigned, or referred, the Contract to Seller.

"Business Day" shall mean any day on which commercial banks are not authorized or required to close in Philadelphia, Pennsylvania.

"Cash Collateral Account" shall mean the interest bearing account into which all Cash Collateral Holdback Amounts will be deposited, established at Univest National Bank and Trust Co. in the name of the Seller but pledged as additional collateral to Purchaser to secure all of Seller's obligations to Purchaser hereunder.

1

"Cash Collateral Holdback Amount" shall mean that specific amount deducted from the Total Purchase Price for each Portfolio of Contracts which shall be held pursuant to Section 5.e. of the Master Assignment Agreement as security for Seller's indemnification obligations and obligations to pay the Contract Balance under the Master Assignment Agreement.

"Charges" shall mean federal, state, and local taxes, license fees, registration fees, assessments and other charges of any kind (including, without limitation, sales, lease, use, excise and personal property taxes), together with any penalties and interest thereon, which are or will be owing to any federal, state, local or other authority by a Person.

"Closing" and "Closing Date" shall have the meaning assigned to such term in Section 2 b. of the Master Assignment Agreement.

"Closing Payment" with respect to a Supplemental Assignment means the Total Purchase Price of the Contracts set forth on such Supplemental Assignment *minus* the Cash Collateral Holdback Amount.

"Collateral" shall have the meaning assigned to such term set forth in Section 3 e. of the Master Assignment Agreement.

"Collateral Custodian" shall mean initially Univest Capital, Inc. or such other Person as Purchaser may designate from time to time.

"Contaminant" shall mean any substance, chemical, compound, product, solid, gas, liquid, waste, byproduct, pollutant, contaminant or material which is hazardous or toxic or any other material or substance which has in the past or could in the future constitute a health, safety or environmental hazard to any Person, property or natural resources.

"Contaminant Activity" shall mean any activity, event or occurrence involving a Contaminant, including without limitation, the manufacture, possession, presence, use, generation, transportation, treatment, storage, disposal, release, threatened release, abatement, removal, remediation, or handling of a Contaminant.

"Contract" shall mean a written agreement (which may be a lease or loan and security agreement) between an Obligor (as lessee or borrower) and Seller (as the lessor or lessor's assignee or lender) under which the Seller leases, or loans monies secured by, Equipment to the Obligor, and including all Guarantees thereof and any other agreements or arrangements of whatever character from time to time supporting or evidencing payment of any such Contract, including any agreements or arrangements with Vendors or Brokers to the extent specifically related to any such Contract, which Contract is identified on a Supplemental Assignment from time to time executed pursuant to the Master Assignment Agreement..

"Contract Balance" as of a particular date for a Contract shall mean the ADCB on such date for such Contract, plus any Scheduled Payments that are due and unpaid as of such date.

"Contract File" shall mean the Contract File with respect to each Contract assigned hereunder to be delivered to the Collateral Custodian under and as defined in the Collateral Custodian Agreement.

2

"Cut-Off Date" shall mean the first day of each month.

"Defaulted Contract" shall mean a Contract as to which (a) the Purchaser has reasonably determined, in its sole discretion and in accordance with its customary servicing procedures, that the remaining Scheduled Payments with respect to such Contract are fully or partially uncollectible, or (b) the Obligor thereunder is delinquent for more than three (3) Scheduled Payments, or (c) the Obligor becomes the subject of any bankruptcy, receivership or insolvency-related proceeding (including but not limited to an assignment for the benefit of creditors).

"Delinquent Contract" shall mean a Contract as to which the Obligor thereunder has not made one or more Scheduled Payments within 30 days of the date when due.

"Delivery and Acceptance Certificate" shall mean a document executed by an Obligor for the purpose of acknowledging that the Equipment has been delivered and finally accepted under the subject Contract by such Obligor.

"Discount Rate" with respect to a Contract shall mean the fixed discount rate utilized to calculate the ADCB rate of interest applicable to and established by Purchaser at the time of the purchase of each Portfolio of Contracts which shall initially be equal to 7.68%.

"Eligible Contract" has the meaning set forth in Section 3 b. of the Master Assignment Agreement.

"Environmental Claim" shall mean any accusation, allegation, notice of violation, claim, demand, abatement, judgment, order, consent decree, penalty, fine, Lien, proceeding (judicial or administrative) or other order or direction (conditional or otherwise) by any governmental authority or any Person in connection with: (a) an actual or alleged violation of any Environmental Law or (b) any Contaminant or actual or alleged Contaminant Activity.

"Environmental Laws" shall mean any current or future statute, ordinance, rule, regulation, order, code, license, permit, decree, judgment, directive or governmental approval pertaining to: (a) the protection of health and safety of the indoor and outdoor environment, (b) the conservation, management or use of natural resources and wildlife, (c) the protection or use of surface water and groundwater, (d) the management, manufacture, possession, presence, use, generation, transportation, treatment, storage, disposal, release or threatened release of any Contaminant; or (e) pollution, including any release to the air, land, surface water and groundwater.

"Equipment" shall mean, as the case may be, the property being leased or pledged as collateral by an Obligor under a Contract, as defined and described in such Contract.

"FMV Contract" shall mean a Contract that is a lease pursuant to which the Obligor thereunder has the option upon the expiration of the Contract term to purchase the Equipment for its then fair market value.

"GAAP" means generally accepted accounting principles as set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board in effect from time to time, consistently applied.

3

"Guarantor" shall mean any Person that executes a Guaranty.

"Guaranty" shall mean a document executed by a Guarantor guaranteeing all or certain obligations of the Obligor under a Contract.

"Indebtedness" shall mean, for any Person, (i) all indebtedness or other obligations of such Person for borrowed money or for the deferred purchase price of property or services, (ii) all indebtedness or other obligations of any other Person for borrowed money or for the deferred purchase price of property or services the payment or collection of which such Person has guaranteed (except by reason of endorsement for collection in the ordinary course of business) or in respect of which such Person is liable, contingently or otherwise, including, without limitation, liability by way of agreement to purchase, to provide funds for payment, to supply funds to or otherwise to invest in such other Person, or otherwise to assure a creditor against loss (including without limitation, any recourse amounts associated with partial recourse obligations of any such Person), (iii) all indebtedness or other obligations of any other Person for borrowed money or for the deferred purchase price of property or services secured by (or for which the holder of such indebtedness has an existing right, contingent or otherwise, to be secured by) any mortgage, deed of trust, pledge, lien, security interest or other charge or encumbrance upon or in property (including, without limitation, accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such indebtedness or obligations, and (iv) capitalized lease obligations of such Person.

"Lien" shall mean any lien, security interest, encumbrance, claim, title defect, charge, pledge, and other similar rights.

"Loss" shall mean any loss, out of pocket costs and/or expenses (including but not limited to attorney's fees and disbursements), deficiencies, fines, penalties or damages arising out of any allegations, suits, claims, actions, legal proceedings, judgments, liabilities counterclaims, and demands of any kind or nature (including, without limitation, arising out of negligence, tort or strict liability and including claims for personal injury or death).

"Master Assignment Agreement" shall mean and refer to that certain Master Agreement For Sale and Assignment of Contracts dated as of December 27, 2011.

"Notice of Assignment" means the Notice of Assignment in the form of Exhibit 3 to the Master Assignment Agreement.

"Obligor" shall mean any Person who or which is the primary obligor under a Contract and is designated as the "lessee" or "borrower" therein.

"Person" shall mean any entity, including without limitation, any natural person, trust, corporation, estate, joint stock association, partnership, proprietorship, limited liability partnership, limited liability company, firm, sovereign entity, government or governmental agency.

"Portfolio" shall mean the group of Contracts which will be offered for sale and assignment to Purchaser hereunder at any time, as evidenced by an executed Supplemental Assignment.

4

"Portfolio Concentration Criteria" shall have the meaning assigned to such term in Section 3.c. of the Master Assignment Agreement.

"Purchase Price Percentage" shall be equal to 100%. This is subject to review at the time of each purchase by Purchaser in its sole discretion.

"Purchase Option" shall mean an option of the Obligor under a Contract that is a lease to purchase the Equipment subject to such Contract for the price set forth in such Contract.

"Purchaser" shall mean Univest Capital, Inc., a Pennsylvania corporation and upon any assignment or other transfer, its successor or assigns, as applicable. Purchaser is also sometimes referred to herein, in the Servicing Agreement and the Master Assignment Agreement as "Owner".

"Put" means and refers to any requirement for an Obligor to purchase the Equipment subject to a Contract that is a lease for a fixed price upon the termination or expiration of such Contract.

"Repurchase Date" has the meaning assigned to such term set forth in Section 5 a. of the Master Assignment Agreement.

"Scheduled Payments" means and refers to the fixed and unconditional monthly lease or loan payments scheduled to be made under the terms of each Contract and any Put or Balloon Payment, excluding any advance payments received and retained by the Seller and excluding the amount of any Security Deposits, sales, use or property taxes.

"Security Deposit" means and refers to any monies paid to Seller by an Obligor as security for the performance of Obligor's obligations under the Contract and not as an advance Scheduled Payment under such Contract.

"Seller" shall mean Trailpods Acceptance Corporation a Florida corporation.

"Seller Advance" shall mean any advance by Seller or any successor Servicer in respect of a Scheduled Payment that is due and payable during a Collection Period but which has not been paid by the applicable Payment Date related thereto, as more fully described in the Servicing Agreement.

"Servicer" shall initially mean Purchaser or, any successor Servicer designated by Purchaser.

"Substitute Contract" means and refers to the substitution by Seller of a new Contract for a Defaulted Contract, subject to and pursuant to the provisions set forth in Section 5.d. of the Master Assignment Agreement.

"Supplemental Assignment" shall mean the operative document executed from time to time by Seller and Purchaser evidencing the sale and assignment of a Portfolio of Contracts and Assigned Property to Purchaser pursuant to and under the terms and conditions of the Master Assignment Agreement, which Supplemental Assignment shall be in a form similar to the Supplemental Assignment attached to the Master Assignment Agreement as Exhibit 1.

5

"Titled Equipment" means and refers to Equipment which, pursuant to applicable law, a security interest must be indicated on a certificate of title therefor as a condition or result of a secured party's obtaining priority over the rights of a lien creditor with respect to such Equipment, including, without limitation, automobiles, trailers, mobile homes, boats, farms tractors and the like.

"Total Assets" means at any date, the amount shown, without duplication, on the books and records of a Person determined in accordance with GAAP.

"Total Liabilities" means, with respect to the Seller, all items of Indebtedness, and all other items which in accordance with GAAP would properly be included on the liability side of a Person (other than capital stock, capital surplus, and retained earnings), as of the date on which the amount of Total Liabilities is to be determined, computed in accordance with GAAP.

"Total Purchase Price" with respect to each Contract in a Portfolio as set forth in a Supplemental Assignment shall mean the product of (i) the ADCB of such Contract being purchased and (ii) the Purchase Price Percentage, calculated as of the Cut-Off Date.

"UCC" shall mean the Uniform Commercial Code, as adopted in the State of Seller's organization or incorporation; principal place of business or in any such other jurisdiction to the extent applicable.

6

Exhibit 1

Form of Supplemental Assignment

Supplemental Assignment No. 1
Purchase Date: December 28, 2011
                  30, 2011

## SUPPLEMENTAL ASSIGNMENT

FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency and receipt of which is hereby acknowledged, and pursuant to that certain Master Agreement for Sale and Assignment of Contracts dated December 27, 2011 (the "Agreement") by and between **Trailpods Acceptance Corporation** ("Seller") and **Univest Capital, Inc.** ("Purchaser"), Seller does hereby sell, assign, transfer and set over to Purchaser, its successors and assigns, all right, title and interest which the Seller has in those certain Contracts set forth and described on "Schedule A", attached hereto and made a part hereof. This document shall not be construed to limit the terms, conditions or description of property and rights being sold and assigned by Seller to Purchaser as stated in the Agreement. All of the terms and conditions of the Agreement are incorporated herein by reference and Seller reaffirms all of its representations, warranties and covenants as contained in the Agreement as of the date hereof.

EXECUTED on December 27, 2011

Seller: Trailpods Acceptance Corporation

By: _____

Title: _____ Vice President _____

Purchaser: Univest Capital, Inc.

By: _____

Title: _____ SVP _____

Page 27 of 27

Exhibit I

| Contract Number | Lessee Name |
|---|---|
| 8 | Burkett |
| 20 | Clinton |
| 18 | Jones |
| 19 | Forrester |
| 22 | Gallo-1 |
| 22 -A | Gallo-2 |
| 7 | Livingston-1 |
| 7 - A | Livingston-2 |
| 5 | M&G Rentals |
| 10 | McLure |
| 6 | Mobile Storage |
| 12 | Preis |

UNIVEST CAPITAL, INC.

By: _____

William J. Clark, Senior Vice President

12.30.2011

TRAILPODS ACCEPTANCE CORPORATION.

By: _____

1/s   Vice President   12/30/11

(Print Name, Title, Date)

Purchase Date: December 30, 2011

This Schedule and Exhibits attached hereto and made a part hereof are executed pursuant to the Master Agreement for Sale and Assignment of Equipment Leases dated as of the 27th day of December, 2011 by and between Univest Capital, Inc. ("UCI") and Trailpods Acceptance Corporation ("Seller") (the "Assignment"). All capitalized terms used herein have the definitions provided for such terms in the Agreement.

This Schedule is dated and effective as of the date set forth below and incorporates by reference all terms and conditions of the Agreement; and, among other things, evidences the sale and assignment of the Contracts by Seller to UCI as of the date hereof, which Contracts are designated and listed on Exhibit 1 attached hereto.

| | | |
|---|---|---|
| 1. | Cut-Off Date | February 1, 2011 |
| 2. | Sum of All remaining Scheduled Payments | $2,084,883.00 |
| 3. | Number of Leases Sold: | 12 |
| 4. | Discount Rate | 7.68% |
| 5. | Closing Date: | December 30, 2011 |
| 6. | ADCB | $952,063.43 |
| 7. | Purchase Price Percentage | 100% |
| 8. | Total Purchase Price: | $952,063.43 |
| 9. | Cash Collateral Holdback Amount | $250,000.00 |
| 10. | Security Deposits/Lessee Reserves Amount | $ 0.00 |
| 11. | Closing Payment: (Item 8 minus items 10-11) | $702,063.43 |

**UNIVEST CAPITAL, INC.**

By: _____
    William J. Clark, Senior Vice President

**TRAILPODS ACCEPTANCE CORPORATION**

By: _____
    I's Vice President    12/30/11
    (Print name, title, date)

December 30, 2011

Univest National Bank & Trust Co.
2645 Street Road
Bensalem, PA  19020

Re:  Account No. _____ and <u>Trailpods Acceptance Corporation Cash Holdback Account</u> (the
"Account").

Gentlemen:

Reference is made to that certain Master Agreement for Sale and Assignment of Equipment Financing Agreements
("Master Agreement") executed on or about the date hereof between Trailpods Acceptance Corporation ("Seller") and
Univest Capital, Inc. ("UCI"), an affiliate of Univest National Bank & Trust Co. ("Bank").

The undersigned, a duly authorized representative of Seller, hereby certifies and acknowledges that the Account(s)
identified above constitute the Cash Collateral Account contemplated by the Master Agreement. The undersigned
Seller hereby irrevocably directs the Bank that in accordance with the Master Agreement, all such deposits in the
Account are hereby authorized to be blocked and subject to withdrawal only upon the signature or other written
authorization of a duly authorized representative of UCI (or UCI's successor or assign) and not upon the authorization
of any other person or entity (including, without limitation, representatives of Seller).  No alterations of these terms
shall be permitted without the written consent of UCI or its successor or assign.

Seller hereby acknowledges that UCI has the right to exert dominion and control over the funds in and the disposition
of the funds in the Account.  Seller further advises Bank that upon the Bank's receipt of written notice from UCI (or its
successor or assign) stating that Seller is in default with respect to its obligations to UCI, UCI shall have all of the
rights and remedies of a secured party under the uniform commercial code with respect to the funds in such Account,
including the right to direct disposition of such Account. Seller further acknowledges and directs Bank that effective
upon UCI furnishing to Seller (with a copy to Bank) written notice of the existence of a Default under and as defined in
the Master Agreement, all monies maintained in such Account shall be irrevocably transferred to UCI, as absolute
owner, subject to the terms of the Master Agreement.

Sincerely,

Trailpods Acceptance Corporation

Univest National Bank & Trust Co, by its execution of this letter, hereby acknowledges UCI's dominion and control
over the above referenced Account pursuant to the terms set forth above.

Univest National Bank & Trust Co.

By:_____

Date: _____



6700 NW 77th Court, Unit 100          Miami, Florida  33166

786.242.6800          786.242.6800/6888 (fax)

Schedule No. 2

Purchase Date: January 5, 2012

This Schedule and Exhibits attached hereto and made a part hereof are executed pursuant to the Master Agreement for Sale and Assignment of Equipment Leases dated as of the 27th day of December, 2011 by and between Univest Capital, Inc. ("UCI") and Trailpods Acceptance Corporation ("Seller") (the "Assignment"). All capitalized terms used herein have the definitions provided for such terms in the Agreement.

This Schedule is dated and effective as of the date set forth below and incorporates by reference all terms and conditions of the Agreement; and, among other things, evidences the sale and assignment of the Contracts by Seller to UCI as of the date hereof, which Contracts are designated and listed on Exhibit 1 attached hereto.

1. Cut-Off Date............................................. February 1, 2011

2. Sum of All remaining Scheduled Payments ............ $251,496.00

3. Number of Leases Sold:................................... 1

4. Discount Rate............................................. 7.68%

5. Closing Date: ............................................ January 5, 2012

6. ADCB...................................................... $99,257.96

7. Purchase Price Percentage ............................. 100%

8. Total Purchase Price: .................................. $99,257.96

9. Cash Collateral Holdback Amount......................... $0.00

10. Security Deposits/Lessee Reserves Amount .......... $ 0.00

11. Closing Payment: (Item 8 minus items 10-11)........ $99,257.96

UNIVEST CAPITAL, INC.                    TRAILPODS ACCEPTANCE CORPORATION

By: _____             By: _____
William J. Clark, Senior Vice President         1B 6LED   1/5/12
                                                (Print name, title, date)

Exhibit J

To Schedule 2

| Contract Number | Lessee Name |
|---|---|
|  | Martin Holdings, Inc. |

UNIVEST CAPITAL, INC.

By:_____

William J. Clark, Senior Vice President

TRAILPODS ACCEPTANCE CORPORATION

By:_____

(Print Name, Title, Date)